Alabama harshly deals with foreign corporations which fail to qualify to do business before entering into contracts here. Alabama is one of four states[1] which permit a party to elect to hold void a contract with a non-qualified foreign corporation. This is the case even where the contract has been fully performed by the non-qualified foreign corporation.[2] CalvertIron Works, Inc. v. Algernon Blair, Inc., 284 Ala. 655,227 So.2d 424 (1969). This statute creates both public policy and private rights. Where facts of a case do not conflict or interfere with, or defeat the public policy of our state, we should recognize that the private rights created by a statute are subject to equitable and legal doctrines which may bar their assertion. In this case, plaintiff has presented evidence that defendant should be equitably estopped from asserting Code 1975, § 10-2A-247 (a), and § 232 of the Constitution. Since I find that the policy of the state is not impaired and in fact may be promoted by the application of estoppel, I respectfully dissent.
We have long recognized that a private party cannot waive, through equitable estoppel or other means, the public policy of the state. See American Amusement Co. v. East Lake Chutes Co.,174 Ala. 526, 56 So. 961 (1911). Where "no considerations of public policy or morals are involved," this Court has said that "[a] party may . . . waive a rule of law, or statute, or even a constitutional provision." Alabama Terminix Co. v. Howell,276 Ala. 59, 62, 158 So.2d 915, 918 (1963). Hence, a statutory right can potentially be deemed to consist of two elements: public policy and private rights. In a given situation where the public policy of a statute is met or not invoked, only private rights remain. As we held in Alabama Terminix, private rights standing alone are subject to equitable estoppel, a form of waiver.
 I. Public Policy.
In analyzing the public policy behind a statute, we must look to the potential reasons for passage which involve the public interest. Section 10-2A-247 and § 232 were aimed at protecting the public in several respects. First, the statute was directed at ensuring that foreign corporations pay taxes and fees. Code 1975, § 10-2A-247 (b). Second, the statute attempts to *Page 882 
make foreign corporations accountable in Alabama courts. A third possible justification is to insure that the foreign corporation is subject to some additional regulatory scheme.[3]
Each of these justifications for § 10-2A-247 is satisfied when a foreign corporation subsequently qualifies to do business. Obviously, in such a circumstance, the state can compel payment of back taxes and the foreign corporation is subject to Alabama courts. As for other regulation, the foreign corporation's past efforts are subject to regulatory review and sanction. To avoid the public policy lash of the qualification laws, the foreign corporation must prove that the subsequent qualification was not in anticipation of a specific legal action. Otherwise, the mutuality of remedy afforded by our public policy would be potentially impaired. See Sea ScapingConstr. Co., Inc. v. McAtee, 402 So.2d 919, 921 (Ala. 1981). So long as the qualification occurs without the anticipation of litigation, our public policy is satisfied.
A final possible policy justification for the qualification laws is that the statute serves as a general deterrent to coerce foreign corporations to qualify before entering into contracts in Alabama. I question whether this argument can be given any weight. Only ignorant foreign corporations would disregard our qualification statutes when entering into in-state contracts; these corporations are obviously unaware of our public policy. Deterrence cannot operate unless the foreign corporation actually knows of Alabama policy. More importantly, disallowing assertion of equitable estoppel would deter beneficial conduct. Foreign corporations, subsequently realizing that they had contracted in violation of the qualification statute, would breach a contract rather than perform work and not be paid. In-state entities would be deprived of valuable bargains unless they would be willing to incur the loss of time and money for litigation. This "transaction cost" will, in reality, often leave our citizens without an effective remedy if we do not allow the foreign corporation to be paid for performing under a contract after subsequent qualification.[4] Hence, § 10-2A-247 and § 232 do not serve the public interest as an alleged deterrent.
Recognizing that our qualification laws are "penal in its nature and in derogation of common law," we construe them so as to exclude cases which do not clearly fall within it. Jones v.Americar, Inc., 283 Ala. 638, 643, 219 So.2d 893, 897 (1969). The public policy is satisfied by subsequent qualification not in anticipation of litigation.
 II. Private Rights
The determination that subsequent qualification not in anticipation of litigation satisfies the public policy of the state does not by itself restrict the defense of § 10-2A-247 and § 232. Indeed, a party may assert the defense as a private right even though the policy behind the law is fulfilled. *Page 883 
However, because subsequent qualification removes any policy concerns, a private party can waive his rights. Hence, subsequent qualification allows the foreign corporation to sue on a contract when the other party is equitably estopped from asserting the defense.
In the present case, Sanjay offered evidence that defendants knew Sanjay was not qualified and offered assistance to Sanjay to make it "legal" to do the construction work in question. Sanjay allegedly relied on these representations in contracting and performing the construction work. If proven, such facts would constitute the basic elements of equitable estoppel. SeeBaker v. Hospital Corp. of Am., 432 So.2d 1281, 1285 (Ala. 1983); Mazer v. Jackson Ins. Agency, 340 So.2d 770 (Ala. 1976). Since we recognize equitable estoppel as a defense in this situation, summary judgment on this issue was inappropriate.
We have reached a similar conclusion in an earlier case. InDay v. Ray E. Friedman Co., 395 So.2d 54 (Ala. 1981), this Court held that a party may, by his conduct, waive the contract defense of § 10-2A-247. In Day, the plaintiff, Ray E. Friedman Co., was an Illinois corporation properly licensed by federal authorities to conduct business as a commodities broker. Friedman, in connection with opening a branch office in Birmingham, entered into a written contract with Day, who was to act as Friedman's account executive in Birmingham. Friedman did not qualify to do business in Alabama until April 12, 1974, more than one month after signing the contract.
On September 30, 1974, Day and Friedman mutually agreed to sever their relationship. Before transferring his license to another brokerage house, Day was required under the rules of commodities exchanges to settle his debts with his former employer, Friedman. The employment contract provided that Day would guarantee to Friedman payment of account deficiencies incurred by Birmingham customers trading on margin. As a result of this guarantee, as well as personal losses allegedly incurred by Day, Day owed Friedman $8,745.34. To settle the debt, Day executed a promissory note for the amount of the indebtedness to Friedman.
Subsequently, Friedman filed suit to collect on the promissory note. Day's answer alleged, inter alia, that the note was void "because of a failure of consideration on the theory that the underlying contractual obligation was void in Alabama at the time when Friedman was a foreign corporation which was not licensed to do business in Alabama." 395 So.2d at 56. In an unanimous opinion on this issue, written by Justice Maddox, we found that Day's conduct after Friedman qualified to do business constituted a waiver of the § 10-2A-247 defense. In affirming the trial court's grant of summary judgment on this issue, we approved the language of the trial court's decision.
 "Following Friedman's qualification to do business on April 12, 1974, Day continued as an employee of Friedman. When he terminated his employment with Friedman, Day executed a promissory note in the principal amount of $8,745.34, recognizing his obligation to Friedman with respect to his own and his customer's debit balances. From the undisputed evidence in this case, the Court concludes that after Friedman had qualified to do business in Alabama, Day by his conduct recognized and adopted the employment agreement entered into by him with Friedman. It is then no defense to Friedman's claim under the note that Friedman had failed to qualify to do business in Alabama at the time the employment agreement was executed. While Day in his supplementary affidavit denies that any part of the balance due under the note represents his own debit account balance, he does not deny that the same represents debit balances of customers procured by him for which he is liable to Friedman under the terms of the employment agreement. There is then ample consideration for the execution of the note. . . ." *Page 884 
395 So.2d at 56-57. Although the Day holding does not expressly refer to equitable estoppel, the behavior involved created waiver and reliance, the essential characteristics of estoppel.
Presumably, the Court was unconcerned with the public policy issue in Day; indeed, like those in the present case, the facts in Day do not appear to invoke the policy concerns underlying § 10-2A-247, since Friedman subsequently qualified not in anticipation of specific litigation and was subject to relevant regulation. I do not entirely dismiss public policy concerns in the present case, recognizing the necessity of formally addressing the issue. Only in this limited sense do I disapprove of Day's approach.
The majority opinion attempts to distinguish Day from this case on three grounds. First, the contract sued upon in Day was a promissory note entered into after the foreign corporation qualified to do business. The issue was whether the note was void because of a failure of consideration related to the underlying agreement entered into at a time when Friedman was not qualified. In other words, the note would have been void if the contract which gave rise to the debt was itself void under § 10-2A-247. Therefore, the issue of the voidability of a contract entered into by a non-qualified foreign corporation was squarely before us in Day. The majority's second ground for distinction is that some of the money owed by Day represented his personal losses while trading commodities. To the extent that Friedman was liable for the personal losses of Day, this liability was apparently the result of the underlying employment agreement. Therefore, the voidability of the contract, even as to Day's personal losses charged to Friedman's account, determined if there was any consideration for the note. The fact that Day owed money to Friedman for personal losses or debts arising from a guarantee can only flow from some contract relationship between the parties, fully subject to § 10-2A-247. Moreover, Day denied that he owned any money personally; summary judgment was only based upon the assumption that the account balance reflected money owed as a result of the contract guarantee. 395 So.2d at 56-57. Therefore, personal losses were not considered by the Court. The third distinction is an attempt to describe Friedman's activities as interstate commerce and thus not subject to state regulation. See Johnson v. M.P.L. Leasing Corp., 441 So.2d 904
(Ala. 1983). Friedman's activities of setting up an Alabama office, hiring employees, and regularly selling commodity shares in Alabama clearly constitute intrastate involvement completely subject to state regulation.
Because the majority opinion fails to distinguish Day from this case, the reasoning in Day must apply here. Defendants' alleged conduct in this case, like Day's, constitutes a waiver of the defense under § 10-2A-247.
In the absence of a public policy behind enforcement of a statute in a given case, a private party's rights under the statute may be waived. In the present case, I find that Sanjay's subsequent qualification not in anticipation of litigation does not violate the public policy of Alabama. Because a party who accepts the benefits of a contract should not be allowed to escape the burdens, Smith v. Edward M.Thompson Agency, Inc., 430 So.2d 859, 862 (Ala. 1983), I would reverse the summary judgment.
ADAMS, J., concurs.
[1] Arkansas, Mississippi, and Vermont are the other three states. See Ark.Stat.Ann. § 64-1202 (1980 repl. vol.);Miss. Code Ann. § 79-3-247 (1972); Vt.Stat.Ann. tit. 11, § 2120 (1973).
[2] Alabama's law in this regard may be unique. For example, Arkansas allows suit on a contract when fully performed. Rose'sMobile Homes, Inc. v. Rex Fin. Corp., 383 F. Supp. 937 (D.Ark. 1974).
[3] In the construction industry, local regulation through building and occupancy permits does not involve the certification of authority required of foreign corporations under § 10-2A-247.
[4] For example, assume X and Y bid on an Alabama construction project for A. X bids $300,000 while Y bids $310,000. X, a foreign corporation, signs a contract with A while not qualified to do business. As X prepares to perform, he discovers his error. Rather than risk the loss of $250,000 (the hypothetical cost of performance), he breaches the agreement with A.
A can sue X for the benefit of his bargain, or $10,000. Of course, A cannot recover the costs of litigation which may exceed this amount. For a discussion of the "American rule" prohibiting fee shifting, see Rowe, "The Legal Theory of Attorney Fee Shifting: A Critical Overview," 1982 Duke L.J.
651. Moreover, A may have lost time, money due to inflation, and other costs of rebidding.
Although A might wish to endorse X's subsequent qualification, X knows that A can later disavow his action when expedient, and the courts will declare the contract void. X will wisely refuse to perform and reduce his loss accordingly. Hence, disallowing application of equitable estoppel will cause our citizens to be faced with a losing proposition.